All right, gentlemen, the first thing I'll do is take attendance. Is Mr. Gale Evans here? Who's the trustee? Who's the trustee? Hal Smith. Hal Smith.  How old? Hollis Smith. All right, sir. Would you stand up, sir? Ah. All right, and Mr. Chance Evans? Would you stand up, sir? Okay. All right, with that, we'll recognize Mr. Dowdy. Thank you. Your Honor, this case, we will contend that all issues that are before this court on appeal at this time are now moot because of a new lease agreement. Very briefly, the two parties to this case are brothers. They are tenants, joint tenants on several properties. This case involves a 120-bed nursing home facility at Natchez, Mississippi, which is owned 60-something percent by the appellee, 30-something percent by the appellant, the brother Gale Evans, Jr. So the property is not owned by the trust. There's not 33.35 percent owned by the trust. Yes, sir. You just said it was owned by the appellant. Well, by the trust. I apologize. That's not what the lease says. Yes, sir. The lease has been ratified by the trustor, and the ratification of the new lease has been placed of record shortly after it was signed in November, two months ago, placed of record in the Chantry Clerk's Office in Adams County, the county where the property is located. When did Mr. Smith become the trustee? He has been the trustee since the death of Gale Smith, Sr., who died in 2019. Was Mr. Smith designated as a successor trustee in the trust on the date of the death? No, sir. He was not required to be. So what was the nature of the successor trustee appointment? Was there an amendment to the trust? We don't have the trust document in the record. Is that correct? We have, as an exhibit, the 2004. Clock. Yes, sir. Ma'am? Sorry. All right. In 2004, Mr. Smith, I'm sorry, Mr. Evans, the appellant, signed a deed from himself to the senior, Evans, Sr., as trustee of the trust. I'm sorry. Who was the trustee in 2004? Ma'am? Sir? The dad. The father.  The dad was the senior was the trustee. Yes, sir. And he served as a trustee until his death at some point in 2019. And you told me earlier that Mr. Smith became the trustee on the death of Sr., but he was not in the trust document at that time. No, sir. And he's not required to be. I'm not suggesting he is. I'm just trying to understand the nature of the trust instrument because we don't have the trust instrument. We have the deed that was recorded in the chancery clerk's office in 2004, and I'll have to go through the documents to tell you when that deed, but it is recorded, deeding the few acres on which the nursing home property, the 120-bed facility, sits. Has $1 ever been paid to the trustee? Your Honor, that point has never been raised. Well, it's pretty important, isn't it? Because the trust document and the trust instrument is the heart of your appeal and your argument that this is somehow moot. And it doesn't look like there has been a single formality of trust law honored from the beginning of this case. Every single dollar that your client ever received was paid to him. Ms. Grayson cut the checks to him. We don't have any record until your letter this week of Mr. Smith's existence in this case. We don't have any record of the trust instrument designating him in this case. And as far as we can tell, this trust is not really a trust at all. It's just your client's alter ego. And your client's not here today, notwithstanding the court's order to be here. Your Honor, I'm sorry that we had a pretty unexpected amount of snowfall where he lives out in Montana and where he's lived for years. But, Your Honor, we will submit that under Mississippi law, this trust meets the requirements of Code Section 918407. And there is a written instrument signed by the trustor. We have an unsigned copy. We're dealing with some. Well, as I see it, I'm not as interested in the niceties of trust law as the fact that this is a lawsuit originally brought by your client individually against Chance Evans. And the order of the court that's on appeal by Judge Bramlett says that Chance Evans' motion to enforce the settlement agreement and First Amendment are granted, that Chance Evans shall form the limited liability company, that your client shall execute and file the deeds contemplated by the settlement. Now, why will your client not perform his side of the settlement agreement? Your Honor, we're appealing that settlement agreement. And we're appealing it because they defied the district judge, circuit judge, court-supplied settlement to it. Well, it wasn't any sloppier than your trust document. So it's up to your client to have agreed just to sign. An LLC is very bare bones, can be a very bare bones document. I assume your client has ulterior motives for not cooperating here. No, ma'am. Excuse me. Pardon me? That's far from the facts in this case. But you're now saying you had to execute a lease or otherwise you'd both have lost everything. So you executed a new lease. Your client actually gets less out of the new lease than he would have gotten under the settlement. Is that correct? No, ma'am. He would have gotten nothing under the settlement. He'd still be an owner of the LLC. The majority of which would have been owned by his brother. And he would have gotten no income. For the last number of years, they've rented this nursing home in Natchez. I doubt that was the intent of Judge Bramlett in enforcing your guy's settlement agreement. It was an agreement. You agreed to settle, you being your client. But Judge, the judge supplied all the settlement material for the new LLC. We never agreed on that. But didn't your client, I mean on that point, your client agreed, under oath I believe, in the district court, that there were no additional material terms to add to the agreement. Isn't that right? Yes, sir. There is one that we So what changed? The parties reach an agreement. The judge asks, let's make sure. You're under oath. Are there any material terms missing? No, Your Honor. Okay. Congratulations. You have yourself an agreement. What changed after that? Knowledge that if we shifted, if we didn't have it in the agreement, the LLC agreement, that of the $52,000 every month that is paid by the operator of the nursing home, that $52,000, $17,000 has been sent to our client out in Montana where he runs a part with the brothers' business. Even assuming everything that you just said is accurate? All we wanted was it in the settlement, in the LLC agreement, that when and if leased, the proceeds of that lease, which have been $52,000 per year for the past ten years under the prior operating company, $17,000 was sent directly to Montana. The balance retained at the time when the father was alive, he had 40%. I understand what you're saying. Couldn't you have negotiated that as part of the agreement? No, sir. We tried. You don't like the deal that you made. You don't like the ramifications of the deal that you made. I understand that. But why couldn't you have negotiated these details before entering the agreement? We offered. But you ultimately accepted the agreement. The whole reason all of these negotiations fell apart was we asked for $17,000 to be specified in the operating agreement for the new LLC, whatever we're going to call it, that $17,000, a portion of the $52,000 a month that was to be paid by the operating company, be distributed promptly and immediately every month to the brother in Montana. When you're relying on a lease and the lease is certain, there are always going to be contingencies in the performance of the lease. So it's not at all clear to me that your insistence on $17,000 flat every month, apparently without contingencies, is not a material term, and if your client had already agreed to the material term. In other words, if we enforce this agreement, then someday your client is going to have to come back from Montana or else he's going to have to give an electronic signature to an LLC. And if at some point Chance Evans starts shorting him on the amount of money he's entitled to, as an LLC participant, I'm sure he's entitled to certain rights of audit. He's entitled to a fiduciary responsibility of the manager of the LLC. So then you either sue him to enforce the settlement or you sue him for breach of the LLC. But as Judge Hendricks said, this is all contingent. It's not a problem at the moment. What is a problem is that he didn't execute the settlement. Your Honor, we ratified the lease. This lease was just signed in early November. That's great. And the first check came in under the lease. The lease is completely clear. All the issues that were out there have been settled, and it's working under the new lease. So let me ask you a question. The lease is now in place, and we have a right. Everybody in a contract has a right to come to a new agreement, a modification of a— Well, it's evident from your brief—I had hoped that would be the case. But it was evident when you filed your motion to moot that the other side didn't agree, so the parties have not come to an agreement. So we have to rely on what originally occurred, which was a settlement order that's been appealed. Your Honor, you can rely on the lease that their client signed in Jackson, Mississippi, in the operator's office. This lease, nobody's contesting any of the issues of the lease. I don't want to be in Judge Bramlett's crosshairs when we tell him that he did everything for naught. Under the new lease, we're operating under it now. The old lease expired December 31. On January 1, the new operator moved in under the new lease, as they are required to do. Under the lease, they submitted $52,000, 17,000 of which was earmarked and sent electronically to Montana, to the brother up there who manages their ranch in Montana. Was that money paid to the trustee, or was that money paid to Junior, the $17,000 that you say was sent to Montana? I do not know that. I cannot say. Do you represent the trust? You keep saying, you represent the trust? Yes, sir. Do you represent the trustee? Yes, sir. And if I can, what we've been wrestling with, this was a very informal trust agreement made by another lawyer a number of years ago, back in 2004. And they filed, as they are allowed to do, a deed from the trustor, who is the appellant in this case, conveying the nursing home in Natchez, the ranch property in Montana, and another nursing home property in Durant, Mississippi, which is in separate litigation at this time. It's worked seamlessly. We asked that the court find that the issues raised in that earlier agreement are moot. I'm sorry, in that earlier brief are moot, and that the new lease signed in November, agreed to by them, agreed to by our client out in Montana, who came back and met with us in Jackson, Mississippi, to sign the new lease with the new company that is operating it today. The other company was gone and made known their intention to vacate the property as of the end of that lease, which was the last day of this past month. We've now got our new lease in place. We don't have anybody that can operate a nursing home properly. So you're co-tenants, right? You're co-lessors, co-tenants in the property, co-lessors on the lease, right? Yes, ma'am. And that's why you're supposed to get money. What happens if somebody dies on that property and files a huge lawsuit against you all? The operating company is required under the lease to have a $1 million minimum liability, just like we've always had, very adequate insurance. Well, that's really good, but you guys, you gentlemen can both, your clients can both be sued individually, can they not? That's never happened. I'm assuming that they could be, yes, ma'am, sued individually. I'm not saying whether. Ma'am? Well, and that's the difference between individuals and LLCs. I'm, I'm, don't. If you were owners of an LLC, the LLC might get sued, but not your clients as individuals. Everybody agreed to sign this new lease that's now in effect. They signed it individually. We signed it individually. And the nursing home, which serves 120 beds, is operating beautifully this day, just like it has for the last 10 years. I'm the prior owner who wanted to get out of it. All right. Well, anyway, your red light is on and you have a chance for rebuttal. And we'll hear what Mr. Reed has to say.  Good morning, judges. May it please the court. Lane Reed on behalf of Chance Evans. I'm going to start this morning just to tell you why we ought to win this appeal. First off, there was a settlement agreement reached with the other side in Natchez, Mississippi, in July of 2023. We read that into the record. The other cases that we've cited and they've cited where the court had to look for evidence, look for something else, that's not the case here. We read it into the record. The magistrate, Judge Rath, asked five questions of their client, who was present that day, and he said under oath, I agree, I understand. Then he asked Mr. Dowdy, he said, Mr. Dowdy, is everything accurate that was read into the record? Mr. Dowdy responded, yes. Then the key point, Judge Rath then said, were there any material terms that were not recited in the record? And Mr. Dowdy, on behalf of his client, said, no, there are not. So there was a settlement reached. It was read into the record. It's clear. That settlement was simply an LLC would be created. One of the primary reasons, Judge Jones, is because of that liability protection protects both of them. And then they simply said it was to be created. It's a Mississippi LLC, and Chance Evans will be manager. Now, there's been a lot of briefing about what else might have been. There's not anything else. There is no requirement under Mississippi corporate law or LLC law that you have an operating agreement. The definition says it can be written, it can be oral, or it can be implied. And, Judge Jones, I know you've done some stuff with bankruptcy. That's that N. Ray Ocho case that they specifically found it was implied. And so all of that is just literally a red herring. And so we can do that, and that's what Judge . . . The only thing that Judge Bramlett said was at the end was until you get an operating agreement, okay, that part was not specifically in the record, but it's the law. The law can supply a material term. And all he said was it will operate just as you say it under the Mississippi Limited Liability Company Act unless you have an operating agreement, which the parties are free under Mississippi law to do at any time. Mr. Dowdy mentions the case. A statute says everybody's got to agree. If you have an operating agreement, then all the members have to agree. It does not say, in fact, the statute says just the opposite. And Judge Bramlett referenced the Coast Plaza case where Judge Corey Jones, who was then on the appellate court in Mississippi, said the exact same thing. You don't have to have an operating agreement. So what's the basis for the case not being moved right now, the LLC? Yes, ma'am. The bottom line is that we, as the court is aware, a settlement is a contract. And my client agreed and negotiated nearly all day with his brother through counsel to have a contract where he would actually give up a small percentage of ownership interest in order to get an LLC. And so the situation was allegedly this trust was in existence. We actually did a lot of discovery on that, Judge Oldham. We couldn't ever get the trust agreement. I don't know that it existed in deposition. I asked his client specifically, is it there? He had originally said, I didn't even put matches in there. And what he told me, Judge, was that this was done by his neighbor, who was a retired attorney in Montana, to get out of some divorce situations, try to hide some property. I asked him who the trustee was because I knew his father was dead. And he says nobody the first time. Well, I waited a minute and asked it again. He says nobody again. But Mark Smith could be in line for it. And so we don't know where it is. It was a trust document or something quoted by Mr. Dowdy. We've never seen it. I don't know where it is. Back to your situation or your question, Judge. This is a revocable live-in trust. All of you know that a revocable live-in trust, primarily to avoid probate, you can change beneficiaries. You can change assets. You can do essentially anything you want to as long as you're living, of course, and in good mental health. And so he could, the individual, he could make the agreement that he made on the record. And so, again, it's a revocable live-in trust. And he has. You mentioned the alter ego, Judge Oldham. That's exactly what he's done with it because in the previous lease that the parties had, Mr. Dowdy mentioned it expired December 31st of this year. There was no reference to a live-in trust. That's a key point. Second, he keeps mentioning this new lease. He swore under oath. Now, the lease is just acknowledged. But if I pointed it out in our response to the clerk, there is a sworn statement to the state of Mississippi, the Department of Health, that he says their client says he owns it, Junior owns it. Well, I understand all that. And I think the trust situation may be a red herring because, in the end, it's Gail Evans, who's the defendant, ordered to execute an LLC. Would the practical difference of the organization of an LLC be that you'd have to reform the lease, I assume, or transfer it or assign it to the LLC, and then the LLC would get all of the rental from the nursing home every month, and then the LLC would disburse the money to the parties? Is that the way it goes? Yes, ma'am. Subject to there may be some management fees. There may be some other issue that's allowed that every single, obviously, you would not want to completely deplete the assets of the LLC because you run into some IRS issues, some liability. You're acting, again, as an alter ego versus running that business. So subject to those things, yes, ma'am. So, in essence, and he had to know that because he was represented by counsel, that is to say, Gail Evans, when he agreed that all the material terms had been agreed on. As I just go back to write what Judge Bramlett cited, he cited, he went, you've seen his memorandum order, and he said, here was the agreement and here's where Judge Rath asked his client under oath five separate questions, and he responded in the affirmative every time. And then he quoted, Judge Bramlett quoted Mr. Doughty, is anything inaccurate, and are all material terms in the agreement? And Mr. Doughty, sitting right there, said yes. Now, let me address, he's talking about some negotiation. Just as an effort to try to settle this matter between two brothers, we did agree to looking at an operating agreement. As Judge Bramlett mentioned, we negotiated with him for six months. No, ma'am, we didn't have to do that. Or no, sir, we didn't have to do that. But again, these are two brothers that we tried to negotiate with to get an operating agreement. And unfortunately, even, and this is in my response to the clerk, even after Mr. Doughty put a letter in writing and said we agree, his client still wouldn't sign it. And again, maybe there was snowfall in Montana in the middle of the summer. I don't know. Okay. Anything else? No. Thank you. All right, sir. Mr. Doughty. You know, it occurs to me that you didn't bother to notify us, your client didn't bother to notify us that he was defying the court order that's been in place for a month. And I understand the perils of travel, and it may very well be a good excuse, but I am rather inclined to send that back to Judge Bramlett and let him order Mr. Evans to appeal and let him decide whether Mr. Evans is willfully violating the order of this court. It's very troubling, and especially when no excuse has been made, not a piece of paper. They clear the roads in Montana very expeditiously. So I just want to let you on notice about that, and you can say whatever else you need to say. Yes, ma'am. There was a question to ask by the panel about the operating agreement, and we covered this in our brief, and there are several other things that concern me about this. We've got a lease in place. 120 beds are occupied. The patients in there are being served. But specifically, and this is in our brief, about whether or not there has to be an operating agreement. Under the legislative amendment, and we cite the laws effective January 1, 2011, Mississippi LLC Law 7929.123 was amended as follows. An operating agreement must initially be agreed to by all members to A, to the extent in addition to restrictions set forth the certificate of formation or the operating agreement may not vary the requirement in subsection 1 that the initial operating agreement must be agreed to by all the members. That's in Mississippi law, and we cited this law in the initial brief we filed before this new lease. Your Honor, at the very least, we'd ask leave of this court to allow us to brief on this point, whether or not there was an operating agreement, whether or not the lower court supplied, the court supplied portions and information to be put into the operating agreement. Counsel, I have one factual question. Is Mr. Hollis Smith, who I gather is your client, is his nickname Mark? Is he otherwise known as Mark? Nickname is Mark. He is first cousin to the younger brother who lives in Meadville, Mississippi. He is first cousin to my client who's worked on their ranch out in Montana for a number of years. And we filed in the Chantry clerk's office in order to meet the deadlines. The nursing home operator was leaving January 31, and we filed a ratification by the new trustee replacing the deceased father who died in 2019. We filed a ratification of this lease agreement signed by the trustee. All right, sir. Thank you very much. We have the case. We'll try to rule on it very promptly. We are in recess.